**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| IN RE ) | |
| ) | Case No. 13-02215-TLM |
| WILLIAM LEE MILLER and ) | |
| NANCY CAROL MILLER, ) | |
| ) | Chapter 7 |
| Debtors. ) | |
| _____ ) | |
| ) | |
| JEREMY GUGINO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 14-06022-TLM |
| ) | |
| CHESTER and JOANN KERSTEIN, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM OF DECISION**

The chapter 7 trustee, Jeremy Gugino ("Trustee"), filed a complaint commencing this adversary proceeding.[1] Trustee alleges defendants Chester and JoAnn Kerstein (the "Kersteins") received from the chapter 7 debtor, William Miller ("Debtor"), a fraudulent transfer which Trustee may avoid under § 548

---

[1] Unless otherwise indicated, statutory references are to the Bankruptcy Code, Title 11, U.S.C. §§ 101–1532, and rule references are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 1

and/or under state law made applicable through § 544(b).[2] The cause was tried and taken under advisement.[3] This Decision constitutes the Court's findings of fact and conclusions of law under Rule 7052.[4]

**FACTS**

According to Debtor's testimony, Investors Property Management, Inc., ("IPM") was an Idaho corporation formed in 2002. Debtor was an owner of IPM, along with his sons Taylor Miller and Steven Miller. In 2009, Debtor sold his interests in IPM to his sons effective December 31, 2009.[5] Debtor executed a January 15, 2010 letter "resigning" as a director, stockholder, and employee of IPM.

Following the sale and resignation, Taylor Miller ran IPM along with a

---

[2] Debtor is married. He and his wife, Nancy, filed a joint petition. Debtor testified; his wife did not. The debtors' schedules establish their assets are all community property, as are most of their debts. (Some debts are shown as "H" or "W" but the record lacks evidence that they are separate rather than community obligations.) References to "Debtor" in this Decision are to Mr. Miller. Those references generally are to reflect his testimony or conduct established by testimony, and use of the singular is not intended to suggest personal, rather than community, obligations or assets.

[3] The testifying witnesses and the admitted exhibits are reflected in the Court's minute entry, Doc. No. 19.

[4] The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157. As reflected by the Pretrial Order entered in this case, Doc. No. 8, all parties have expressly consented to this Court entering final orders and judgment in this proceeding on all matters, including those that are non-core or those that are statutorily core but are or may be argued to be outside the constitutional authority of this Court (*i.e.*, so-called "*Stern*" claims"). *Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, 135 S.Ct. 1932 (2015).

[5] Taylor Miller testified that Debtor effectively "gifted" his ownership interests at that time.

MEMORANDUM OF DECISION - 2

bookkeeper and a few other employees. Debtor also worked on his own separate business affairs at the IPM office suite for a period of time and, in 2010, paid IPM "rent" for a small office. Debtor testified his post-2009 work was either as an individual or, at some point, in connection with Miller Real Estate Services, LLC (at times in this Decision, "MRES"), a limited liability company for which he was the sole member and manager. There is no evidence establishing that after the resignation in January 2010, Debtor worked as an employee of IPM or served any role with IPM.

IPM was engaged in the property management and maintenance business. For a number of years prior to July 2007, the Kersteins used IPM as the property manager for several of their real estate investment properties. IPM found and dealt with tenants, took and held security deposits, paid the expenses associated with the properties including maintenance and repair, and accounted for the cash in and out through monthly statements. On July 31, 2007, the Kersteins entered into a new, written management agreement with IPM. Ex. 102.[6] Debtor signed that property management agreement on behalf of IPM.

Debtor acknowledged in his testimony that, up to his resignation in January 2010, he was the "point person" in the IPM property management business,

---

[6] CCK Investments ("CCK") was identified as the party that entered into the written agreement with IPM. CCK was not shown to be a corporation, limited liability company or other entity. The Kersteins' state court complaint against Debtor, IPM and Taylor Miller alleged that CCK was the Kersteins' assumed business name. Ex. 105.

MEMORANDUM OF DECISION - 3

including in its dealings with the Kersteins. Mr. Kerstein testified that he had been referred to Debtor's business by a previous property manager who was retiring. He stated he placed trust in individuals, not their corporations, and he relied on that former property manager's representations about Debtor's honesty. He felt he was working with Debtor, even though the contract was with IPM.

Mr. Kerstein testified that, at some ill-defined point, the statements received from IPM triggered concerns on his part. It appeared the properties were not performing, and the revenues from the rentals were dropping. And it seemed that bills associated with the properties were not being paid. Workers and vendors started to demand direct payment from him, and some threatened to file liens on his properties.

Mr. Kerstein received a letter from IPM on September 13, 2010, detailing multiple outstanding "back charges" allegedly due to IPM. IPM asserted the total account balance was a "negative" $148,224.38 (meaning the Kersteins owed IPM that amount). Ex. 205.[7] Discussions to address the matter were unsuccessful.[8]

---

[7] Some of the charges referenced items alleged to have accrued in 2010. However, one charge was calculated from 2007, two of the charges started in 2008, and one referenced accruals from 2002 through 2010. The totals of these several itemized charges is $184,649 and does not reconcile to the alleged "negative" account balance claimed. *Id.* There were other bills and statements to the Kersteins detailing account activity and amounts allegedly owed in addition to Ex. 205. *See* Exs. 206, 208.

[8] Debtor did acknowledge "bumping into" Mr. Kerstein at one point after the resignation, due to the adjacent office arrangement. Debtor also stated that he and his son, Taylor Miller, met the Kersteins for coffee in the fall or winter of 2010, but could not recall if the financial demands were then discussed. There was no evidence that IPM ever sent a copy of the
(continued...)

MEMORANDUM OF DECISION - 4

The Kersteins elected to terminate the management contract. IPM then "offset" over $140,000 owed by the Kersteins against amounts IPM owed to the Kersteins. IPM failed to transfer tenant security deposits to the Kersteins' replacement property manager.

In May 2011, the Kersteins filed suit in Idaho state court against IPM, Debtor, and Taylor Miller. Ex. 201. They asserted claims for breach of contract, breach of implied covenants of good faith and fair dealing, fraud,[9] breach of fiduciary duty[10] and an accounting. The prayer of the complaint sought judgment against IPM on the breach of contract and breach of implied covenant causes of action. It sought judgment against all the defendants, jointly and severally, on the causes of action for fraud and breach of fiduciary duty. Ex. 105 at 8–9. The defendants, collectively and through a single attorney, answered and IPM asserted a counterclaim for breach of contract and unjust enrichment related to the amounts allegedly owed by the Kersteins. Ex. 202.[11]

---

[8](...continued)
January 2010 resignation letter, or any other notification of the termination of Debtor's relationship with or authority over IPM, to any of IPM's clients, including the Kersteins.

[9] The allegations sounding in fraud alleged that the defendants, collectively, caused financial reports to be issued that contained material omissions and material misstatements of fact, with the defendants' knowledge, and with the intent that the Kersteins rely on them. Ex. 105 at 6–7.

[10] The allegations regarding this cause of action asserted that each individual defendant, as well as IPM, was a fiduciary (primarily regarding security deposits) and all breached their respective fiduciary duties. Ex. 105 at 4–5.

[11] The answer asserts that the Kersteins ceased using IPM's services on some properties
(continued...)

In May 2012, following mediation, the disputes among all parties were settled.[12] A "settlement agreement and mutual release" was prepared and executed by the parties on May 10. Ex. 110. The "defendants" (IPM, Taylor Miller and Debtor) collectively agreed to pay the Kersteins $50,000. *Id.* at 1 ("Defendants shall make a total payment in the amount of Fifty Thousand Dollars ($50,000.00) to Plaintiffs.") In return for such payment, all parties released all claims or demands. Under the agreement, the Kersteins did not pay anything to IPM, Debtor or Taylor Miller.[13]

The agreement called for payment by certified check the following day. The Kersteins received a May 11, 2012 cashier's check for the settlement amount. Ex. 111. The funds for the settlement were generated in the following fashion.

A $40,000 check dated May 9, 2012, was issued and made payable to Debtor personally. That check was drawn, by Debtor, on a Key Bank account in the name of "Miller Commercial Real Estate," which was a "dba" of Debtor. Exs. 107, 108.

---

[11] (...continued)
in March 2010, and that they terminated the management agreement in August 2010.

[12] Debtor and Taylor Miller filed a motion for summary judgment seeking to be dismissed from the case on April 30, 2012. Ex. No. 106. The state court never addressed the summary judgment motion because the parties elected to mediate and, on May 11, 2012, filed a stipulation with the state court to dismiss the action with prejudice.

[13] Mr. Kerstein testified that he had exposure to unpaid vendors on his properties, and to tenants for security deposits, in a total amount greater than the $50,000 he received. Nevertheless, he and his wife settled.

MEMORANDUM OF DECISION - 6

Debtor deposited this check in a Wells Fargo Bank account. That account was a business checking account in the name of "Miller Real Estate Services, LLC," Debtor's limited liability company. Ex. 109.[14] When the $40,000 deposit occurred on May 9, this account had a substantial preexisting balance. Thus, Debtor was able to withdraw $50,000 on May 11, which was the source of the cashier's check, Ex. 111, used in the settlement.[15]

After the $50,000 settlement payment was made, Debtor drew $15,000 from the Miller Commercial Real Estate Key Bank account. The check was dated May 30, 2012, and it was deposited in the MRES Wells Fargo account the same day. Exs. 107–109.

Debtor testified that even though he felt he had no personal liability to the Kersteins, especially after resigning in early 2010, his attorneys advised him differently.[16] In further explaining why he gathered the funds used in settlement,

---

[14] The account uses the full name of that LLC, and is denoted as an "Advantage Business Package Checking" account. *Id.*

[15] On May 8, there was a $35,570.94 balance in the Miller Real Estate Services, LLC account at Wells Fargo Bank. On May 9, the above-mentioned $40,000 check was deposited, as was another $12,301.84 deposit from what Debtor characterized as MRES rent receipts. This effectively established a balance of $87,872.78. On May 9, checks and a point of sale purchase reduced the balance of the account to $62,113.24. (The account statement shows such details plus daily ending balances.) On May 11, after a check card purchase, a point-of-sale purchase and a small withdrawal, there was an effective balance of $62,046.01. From this balance the $50,000 cashier's check was obtained, leaving a balance of $12,046.01. Ex. 109 at 2.

[16] Debtor and IPM hired Perkins Coie to file the answer and counterclaim in state court, Ex. 202, and Perkins Coie was counsel of record until a March 2012 substitution of another firm, Moffatt Thomas. *See* Ex. 106 (Idaho case repository docket). Debtors' schedules show claims of $37,298.69 and $24,680 asserted by the two law firms respectively. The state court docket, and
(continued...)

MEMORANDUM OF DECISION - 7

Debtor testified that his son also had serious medical issues and so he also, "as a father," wanted to get the case settled.

Debtor and his wife filed for joint chapter 7 relief about a year and a half later. In answering question 10 on their statement of financial affairs, which calls for identification of all transfers within two years of the October 30, 2013 petition date, Debtors did not disclose the $50,000 paid on May 11, 2012 in settlement of the Kersteins' lawsuit. Ex. 101.[17]

Debtor testified that the assets and liabilities listed in the bankruptcy schedules in October 2013 would have been roughly the same in May 2012, when the settlement with the Kersteins occurred. Debtor explained that the value of their home might have been "slightly higher or about the same," and Debtors owned no other real estate at that time. They did exchange one vehicle for another, selling a GMC Yukon in October 2013 and gaining a BMW, but with no net gain. Beyond such minor variations, he stated that the number and value of assets in May 2012 was about the same as on the petition date.

Debtor also indicated that their liabilities were about the same at both

---

[16](...continued)
the amount of the legal bills, reflect the nature and magnitude of the settled litigation.

[17] However, Debtors did disclose the Kersteins' lawsuit in response to question 4, and indicated that action was "dismissed after settlement." *Id.* That response also identified several other lawsuits in which Debtor, Taylor Miller and IPM were all named as defendants.

MEMORANDUM OF DECISION - 8

points. The amount of debt at bankruptcy was approximately $708,000.[18]

Schedule F includes numerous creditors asserting claims against Debtors for IPM-related liabilities. *See* Ex. 101. However, even excluding those creditors (all of whom were scheduled as disputed, contingent and unliquidated), Debtor testified that in 2012, they owed one law firm close to $24,000 and another about $37,500. There was a $425,000 line of credit owed to Key Bank on a 2010 short sale. And there was a $41,000 liability on a co-signed equipment lease to another bank. These amounts alone exceed $525,000, far outweighing the approximately $28,400 of equity Debtors had in real estate[19] and the aggregate value of their personal property.

## DISCUSSION AND DISPOSITION

Trustee's action is brought under § 548(a)(1)(B).[20] Trustee prays that, under this section, the transfer of $50,000 to the Kersteins on May 11, 2012, be avoided and recovered from them under § 550(a) for the benefit of Debtors' estate.

---

[18] Debtors' schedule D shows $63,712.00 in secured real estate debt and their schedule F shows a total of $644,643.09.

[19] Debtors' schedule A indicates they own a 50% interest in real estate, and their son owns the balance. The alleged equity of $56,788 (value of $120,500 less secured debt of $63,712) is thus divided in half to determine Debtors' equity interest.

[20] The § 544(b) cause of action pleaded, *see* Doc. No. 1 at 5, echoes that under § 548. Trustee did not focus any written or oral argument on the Idaho state law made applicable under § 544(b) outside of a footnote in briefing indicating "the standards . . . are not significantly different" from those under § 548. Doc. No. 14 at 3 n.1. Ordinarily, § 544(b) is used to provide a plaintiff trustee with a longer avoidance period than the two years provided under § 548(a)(1). That was unnecessary here.

MEMORANDUM OF DECISION - 9

This Court summarized:

> There are multiple elements that must be established by a plaintiff to sustain a cause of action under § 548(a)(1)(B). There must be a "transfer" of property of the debtor that occurs within two years of the filing of the bankruptcy petition. The debtor must have received less than "reasonable equivalent value in exchange for the transfer" and the transfer had to have occurred when the debtor was insolvent or the debtor had to be rendered insolvent as a result of the transfer. Plaintiffs bear the burden of proving all these elements in order to recover under § 548.

*Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 440 (Bankr. D. Idaho 2008) (citing *Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701, 703 (Bankr. D. Idaho 1994)). Trustee bears the burden of establishing all the § 548(a)(1)(B) elements. *Id.*; *Murietta v. Fehrs (In re Fehrs)*, 391 B.R. 53, 73 (Bankr. D. Idaho 2008).

### A.    Insolvency

Insolvency is defined in § 101(32)(A) as a "financial condition such that the sum of such [debtor]'s debts is greater than all of such [debtor]'s property, at a fair valuation[.]" A "balance sheet" standard applies in § 548(a) litigation. *See Sampson v. Western Capital Partners, LLC (In re Blixseth)*, 514 B.R. 871, 880–81 (D. Mont. 2014) (citing *In re Koubourlis*, 869 F.2d 1319, 1321 (9th Cir. 1989)).

As shown by the evidence outlined above, Trustee met his burden of proving Debtors' insolvency on May 11, 2012, the date of the challenged transfer.

### B.    Transfer

The Code broadly defines transfer in § 101(54) as every "mode, direct or

MEMORANDUM OF DECISION - 10

indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property, or (ii) with an interest in property."[21] Trustee bears the initial burden to demonstrate that Debtors made a transfer within two years of filing that is avoidable and recoverable from a defendant transferee.

Trustee's complaint puts at issue the cashier's check of $50,000 received by the Kersteins on May 11, 2012. In doing so, Trustee focused on the May 9 $40,000 check and the May 30 $15,000 check. Neither of these checks was tendered or transferred to the Kersteins. Indeed, the $15,000 check was written on the Key Bank account and deposited in the Wells Fargo account on May 30, almost three weeks after the cashier's check was delivered to the Kersteins on May 11.

As noted, the Key Bank account was in the name of Miller Commercial Real Estate, a "dba" for Debtor. The Key Bank funds were, therefore, Debtors' personal funds. The $40,000 May 9 check from that account was deposited in the MRES Wells Fargo account. The $40,000 was commingled in the MRES account with other LLC funds. After several transactions, the cashier's check was issued out of the MRES Wells Fargo account and used in the May 11 settlement with the Kersteins.

---

[21] For determination of property interests or rights, the Court must look to state law. *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (noting that generally "'property' and 'interests in property' are creatures of state law"); *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of the bankrupt's estate to state law.").

MEMORANDUM OF DECISION - 11

Trustee gives superficial attention to the fact that the funds transferred to the Kersteins came out of this LLC account. In briefing (and in mistakenly arguing that the intervening entity was IPM), Trustee emphasized the sequence: that the $40,000 (and the later $15,000) originated in Debtors' account, was transferred to the entity, and the entity "[a]lmost immediately" issued the cashier's check to the Kersteins. This overview ignores the timing of the transactions.

MRES had substantial funds in its business checking account on May 9, 2012. There was a pre-existing $35,570.94 balance when the $40,000 check was deposited. And later the same day an additional $12,301.84 was deposited. While Trustee emphasizes that $40,000 came from Debtor's account, the prior balance and the other deposits totaling $47,872.78 was not shown to have a similar source. And other MRES banking activity occurred after the $40,000 deposit and before the $50,000 cashier's check was issued.

MRES was formed as a limited liability company in February 2011.[22] Pursuant to Idaho law, a limited liability company is "an entity distinct from its member or members." Idaho Code § 30-25-108(a) (effective July 1, 2015; formerly codified at I.C. § 30-6-104(1)). Debtor testified that MRES continued to

---

[22] Pursuant to Fed. R. Evid. 201, the Court takes judicial notice of the public information maintained by the Idaho Secretary of State regarding business entity filings. (*See* www.accessidaho.org/public/sos/corp/search/html). It shows Miller Real Estate Services, LLC was registered on February 8, 2011 with William Miller as member and registered agent. On June 5, 2012, its name was changed to Miller Real Estate and Management Services, LLC. Annual reports have been filed through 2015.

MEMORANDUM OF DECISION - 12

conduct its property management business after 2012 until March 31, 2015, and regularly deposited approximately $25,000 per month into the Wells Fargo account.

Funds (*i.e.*, $40,000) went from Debtor (via check on the Key Bank "dba" account) to Miller Real Estate Services, LLC (via deposit into the Wells Fargo account) on May 9. The transferor (Debtor) and the transferee (MRES) were separate entities, and Trustee presented no evidence to the contrary. The MRES account not only had an outstanding balance, but other funds went into, and came out of, that account. And, because the $15,000 check was drawn and deposited weeks later, some portion of the $50,000 that was used to acquire the cashier's check clearly was not traceable or attributable to any transfer from Debtor's Key Bank account.

A transfer clearly occurred from Debtor to MRES. However, MRES was the transferor of the $50,000 to the Kersteins at issue in this action.

The Kersteins raise this issue, *i.e.*, that they were not the "initial" transferees, as well as arguments regarding limitations on a trustee's power of recovery under § 550(a) and (b) from immediate or mediate transferees. Trustee's position is that the transfer to MRES "was for the benefit of" the Kersteins and thus Trustee pursues recovery from them on that basis under the language of § 550(a)(1), and not as the "initial" transferee under such section, nor as immediate or subsequent transferees under § 550(a)(2). That approach, however,

MEMORANDUM OF DECISION - 13

neglects the fact that at least some part of the $50,000 sought by Trustee in this proceeding was not shown to have originated in a transfer from Debtor at all. By May 11, Debtor had transferred only $40,000 from the Key Bank account to the MRES Wells Fargo account. Moreover, given the other funds in, and activity in, that MRES Wells Fargo account, Trustee did not prove what portion of the $40,000 was used "for the benefit" of the Kersteins.

The Court, however, sees no reason to belabor the analysis here, because Trustee must establish all elements of the cause of action, and he has failed to do so.

### C.  Reasonably equivalent value

*Jordan* discusses at length the element of reasonable equivalence. 392 B.R. at 441–47. "The key to th[e] matter is determining the value received by Debtors in exchange for the [property or] interest they transferred to Defendant." *Id.* at 441. Thus, here, the key is determining what Debtor received in return for a maximum of $40,000 transferred on May 9 which, Trustee asserts, was "for the benefit of" the Kersteins.

*Jordan* holds that indirect benefits as well as direct benefits may constitute value if sufficiently concrete and identifiable. *Id.* at 442. In evaluatintg what was exchanged in a *quid pro quo* transaction, "[r]easonable equivalence can clearly include the elimination of claims or litigation." *Id.*

The Kersteins' state court complaint generally alleged damages under each

MEMORANDUM OF DECISION - 14

of the four causes of action "in excess of $25,000, the exact amount of which will be proven at trial." Debtor testified that the Kersteins "settled a $140,000 claim for $50,000," and that IPM waived a $130,000 claim asserted against the Kersteins.[23] And, while the Kersteins accepted the mediated settlement, Mr. Kerstein acknowledged the $50,000 did not come close to covering the vendors' and tenants' claims he faced that he felt were Debtor's and IPM's responsibility.

The settlement here, like most, was not an outright victory for either side. It was the result of mediated resolution of ongoing litigation. There was nothing to suggest the settlement was anything other than an arms-length resolution of contested factual and legal issues.

Trustee argues that, at least in his view, Debtor's exposure in the state court lawsuit was minimal and, thus, the settlement of the litigation cannot support the reasonableness of the transfer. He focuses on the fact that, as of January 2010, Debtor had resigned from IPM and the disputes with the Kersteins arose thereafter.

This focus ignores the genesis of the Kersteins' claims, and those of IPM against the Kersteins, which substantially related to times when Debtor was the owner and "point man" for IPM. The alleged misuse of tenant security deposits were not shown to relate to solely post-December 2009 lessees or funds. Nor were

---

[23] In the complaint, the Kersteins alleged that IPM had asserted an "offset" of $140,304.24 against amounts owed the Kersteins. Ex. 105 at 3. As noted earlier, Ex. 205 claimed a $148,000 debt owed by the Kersteins.

MEMORANDUM OF DECISION - 15

the assertions of fraud in financial reporting and the treatment of property maintenance and expenses similarly limited in time. The breach of fiduciary duty claims and fraud claims against Debtor were pending as of the mediation. Even if Trustee, from his blinkered perspective, feels the Kersteins' complaints against Debtor lacked heft, they were not without some foundation, and they were interrelated to the claims against Taylor Miller and IPM. Moreover, the Kersteins sought to have all the state court defendants held jointly and severally liable. And those defendants incurred substantial fees in defense.

*Jordan* noted the applicability of the analysis of the court in *Schaps v. Just Enough Corp. (In re Pinto Trucking Service, Inc.)*, 93 B.R. 379 (Bankr. E.D. Pa. 1988). *See* 392 B.R. at 443. *Schap* noted:

> While it is true that a totally groundless claim or a non-dispute may not constitute consideration, the courts will not look at the underlying merits of a compromise very critically to determine its worth. "The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of that compromise is to avoid the risk or trouble of that question."

93 B.R. at 389 (citations omitted).

Trustee bore the burden of proving that, if Debtors were deemed to have made a transfer to or "for the benefit of" the Kersteins, Debtors did not receive reasonably equivalent value. The many-hued factors affecting a determination of value and of reasonable equivalence are set out at length in *Jordan*. Applying those factors and principles to the evidence here, the Court concludes Trustee did

MEMORANDUM OF DECISION - 16

not carry his burden on this element.

**CONCLUSION**

Trustee failed to meet the burden of establishing all elements required to avoid the subject transfer under § 548.  Judgment will be entered for the defendants Chester and JoAnn Kerstein.

DATED:  September 8, 2015



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 17